Case 24-1329 Kevin Lavery v. Pursuant Health Inc. Argument not to exceed 15 minutes per side. Counsel, you may proceed for the appellant. Good morning. Good morning, Your Honors. I'd like to reserve two minutes for rebuttal. There's a surprising tension between federal law and state law here, perhaps not so surprising. And the way that I'd like to address that is to emphasize five points. Hopefully I'll have time. I think we're fortunate to have two experts. When I first heard about this case, I was like, oh, what are we doing with a patent case? So you're pretty comfortable we have jurisdiction. Yes. No, we concede jurisdiction because there is, as I say, there's a tension between Delaware law would certainly enforce the agreement. There's no doubt that it was made and there's, the defendant has not denied that it made the promise. As you know, it's a perpetual royalty case and Brulotte and Kimball would say that if it's a perpetual royalty that was extracted under undue leverage situation that federal patent law preempts the state law, which would enforce the contract. Last night I was shepherdizing some of the cases and I meant to conclude with this, but there's a state court case out of Delaware, Delaware Superior Court, and the state judge there wrote a pretty good opinion summarizing the state of the law, especially since these three circuit court opinions, which have come down this last summer. And he captioned one of his headings was the unpopular Brulotte rule and its nebulous bounds. And I think in this case the bounds are not, we fit comfortably within, or sorry, I should say we fall outside of those nebulous bounds. Can I just be really candid with you? So I get the discomfort with Brulotte, but I have to say I'm a huge admirer of Judge Kagan's, Justice Kagan's opinion because I just love how she, I think, rationalizes the law. I mean, she takes a Justice Douglas opinion and spins some straw into gold from my perspective. I mean, so many of the things that are problematic about Brulotte, Brulotte, however you pronounce it, aren't as problematic after her opinion. And so to me, I feel like it's a case where we just have to forget Brulotte. Let's just focus on, did you guys take advantage of any of these ways of accounting for, or I guess their options for extending payments? And that's the question in the case. So be it that Brulotte is hard to defend. I think Marvel's a lot easier to defend. I think, Chief Judge, you're in the minority because I think most judges that have looked at this have found that Justice Kagan oversimplified the problem. She said, you know, it's just a matter of if it's a royalty on a license agreement, it doesn't pass muster if there is it. And most judges that have looked at this, I think, would disagree with you. And plus it goes against the judicial tendency to want to enforce contracts, right? We want to make parties live up to their bargain. So I don't know that I've answered your question or perhaps it was more of a comment, but I do think that there is certainly a tendency, as the last three circuit opinions have demonstrated, that at the appellate level, judges are very uncomfortable tossing out these contracts based on kind of soft, nebulous founds. Well, I just thought, I don't want to pry, but I'm guessing you weren't the lawyer at the time this contract was negotiated? Correct. Okay. And I'm guessing had you been the lawyer at the time this was negotiated, you would have realized the flexibility built in, trade secret. Okay? So that's outside patent, outside the 20 year. It's not unusual to have trade secrets in connection with patentable property. I can just imagine you doing this in your sleep and just saying, here's how we do it. What I would have done is I wouldn't have called it a royalty because that's the trigger word that brings this whole thing within the ambit of- You would have done two things. You wouldn't have called it a royalty and then you would actually have identified the trade secrets in the agreements. If I knew about Brulat, I mean, I've been practicing patent law a long time and Brulat was kind of this vague thing that if you were a diligent student, you might've read the case before class, but it's not a high profile case. It wasn't until Kimball. But that's interesting because it's surprising how- Why is that? I'm quite shocked by that. I can't imagine a contract that turns on transfer of patent rights or the patent lawyer wouldn't know about this. I mean, that's exceptional to me. The difference between 20 years and not? It's kind of like the last case you were just hearing. It's in hindsight, everything's obvious, right? But as the Supreme- You're the expert. I had not heard of Brulat either, but I have a much better explanation for that. Oh, right. Because you're not practicing patent. Can I talk about one conceivable distinction of Brulat, which is your- I think it's your theory that if the royalty is on a product that doesn't use the patent, that somehow- Is that something that the circuits have created to get around Brulat, or is that something that's in Marble? It's not in Marble or Kimball, as I usually call it. It is in Zimmer, which is the Seventh Circuit case, which upheld post-expiration royalties. And it's also in Arias. So it's not clear to me why- I mean, nobody's going to defend Brulat, or however you pronounce it, but it is the law. And once you say it's the law, I don't understand. I mean, what if it was expressed that it said, in exchange exclusively for this patent, I am going to grant a royalty on a product that doesn't use the patent? Why wouldn't Brulat apply to that royalty and just expire at the 20 years, just as much as if it was a product that used the patent? I don't understand the distinction. Well, because Brulat, the reasoning in that case, it had all these antitrust overtones, and they were talking about leverage a lot. And that judicial mindset of looking at the leverage of the patentee versus the licensee has survived Brulat. And so I don't- that is such a what-if hypothetical, but I would say that Brulat would not prohibit that because there would have been no leverage, which was the primary consideration of the Brulat court. The patentee would have no leverage because, look, you don't want to use my patent, you want to use something else, but we'll put the sales base on that something else. You said something- I just want to make sure I'm not misunderstanding this area of the law, that when you use the word royalty, one first thinks patent. But I actually thought royalty could be used for trade secret. Am I wrong about that? That is absolutely correct. Okay, so I was thinking it was a little question begging to just look at the word royalty because it doesn't prove that it wasn't for a trade secret. Okay, and this is my fault that I'm not getting my point across well enough in the briefs. And this happened at the district court too. This was a joint venture. I want to make sure I really get that in. I did not emphasize that in my principal brief, but in the reply brief I tried to. It's truly a joint venture. These two guys got together, they both contributed their stuff, and they went out and they started a company. And having the term royalty in that agreement was- I've lost my train of thought, but that is what brought us here. I hear what you're saying, that it does cabinet to patent intellectual property. I get that point as opposed to joint venture stuff. But, you know, Lavery gets to work for the company. That's where he gets stock. That captures the joint venture just as well, though. It's not in the record. I shouldn't say anything, but no, it didn't. Tell us why, since trade secret royalties are outside of Brulot, Marvel, what is it in the agreement that we can say is a trade secret that was being purchased? Because it uses the word, but then it uses the word in connection with the patent. So it's just not- it's hard for me to find out how to get a handhold on that. I will answer that question, honest. But I still think it's wrong to try to shoehorn in these facts into a trade secret, because we're trying to fit a round peg into a square hole. Okay, all right. Well, then don't even waste your time. Keep going with the joint venture point you were trying to make. Well, I will, though. Sorry for contradicting you, Judge. Because there is a way to reconcile those. And that's the royalty, the perpetual royalty was given in exchange for the contribution. The contribution was Appendix B, the intellectual property. I have not yet made this point in the briefing, but the intellectual property is defined as the patent and all these other things, but it's attendant to the patent. It wasn't until I was preparing for the court- Yeah, that's the key. I mean, the main argument from the appellees is that there really wasn't anything else. Well- We're wearing the record. I mean, you've identified the services he provided, but it seems to me that they have a pretty good response, that that's covered by the consulting agreement and you got compensation under the consulting agreement. I just don't see as a factual matter what intellectual property was transferred apart from the patent. Well, the intellectual property includes things that were attendant to the patent. What are those? The consulting agreement was attendant to the patent. All of his services- The consulting agreement itself, you're paying a royalty for this agreement? In addition to what's in the consulting agreement. The consulting agreement had a high threshold. You had to work, whatever it was, 20 hours a month or something like that to get paid, and he never submitted an invoice. He was never paid under that because his primary compensation was this future promise of a perpetual royalty. No, no, no. He also was a shareholder. But that's been diluted to virtually nothing. His equity stake in this company now is nothing, which that is in the record. It's the letter of intent, which is more- So is it your view? The only thing that I really see here were his services provided after. And so it's your view that those services themselves are somehow intellectual property? They are attendant to the patent, yes, Judge, because-  I'm sorry. I view services as labor. It's like getting an hourly wage, hourly rate, and you view that as intellectual property, too? Because the language isn't anything attendant to the patent. It's a specific thing, like trade secrets or other intellectual property, isn't it? I don't have the language in front of me. I looked up the definition of attendant, because it's not something we use, of course, every day. And Merriam-Webster says accompanying or following as a consequence or result. But it's not services. It's proprietary information, trade secrets, and other intellectual property. So you're right. It has to be attendant to the patent. So that just means related to the patent, in my view. Yeah, make it even easier. Relating is even broader. Yeah, there you go. We'll give you relating. But find something that is either- so you kind of haven't identified a trade secret, so that we still have proprietary information and other intellectual property, other intellectual property rights. And so what are those? Other than everything that I've already briefed, the services that you classify them as services, but when you're giving advice, you're necessarily imparting knowledge. And here's angels dancing on the head of a pin. Does it have to be a trade secret to be proprietary? The district court thought yes. But as- not to testify here, but there's lots of proprietary information that doesn't qualify as a trade secret. But why? I mean, I'm totally with you on this. I mean, but why isn't that still establish a burden of identifying it? In other words, the more you're right about this, the easier it should have been. True. Well, no, I'm not going to concede that you're right. If I see my time is up, I did not touch on- I don't want to force- you're free to do it on rebuttal. We're very fortunate to have some good lawyers here. We want all the help we can get. So if you want to circle back and we can talk about it on rebuttal, either way, fine. Now we're on rebuttal, sir. Whatever you want, whichever you prefer. Well, I did want to just point out that this obscure area of law has now been addressed three times by your sister circuits, and all of them enforced post-expiration patents. Was it not because they had agreements that compensated for non-patentable property? Two of them were that they looked at- And then the Seventh Circuit is just an arbitration agreement, right? Yes. Okay, so the other two, I thought it was pretty clear. They did what we've been talking about, identified the other IP or the other proprietary information, whatever you want to call it. I would say that's not entirely accurate, Your Honor. In the Third Circuit case of Aries, which is a big, complicated case of pharmaceutical development, in that case, they looked at the underlying sales base on which the royalty was calculated. And they said, look, it's a different sales base, and that influenced their decision. But the main thing is that the circuit courts seem to be imposing higher and higher standards, the clear evidence, for example, of preemption, which we are advocating for, which was my first point. But my time is up, Your Honor, so I don't want to- You'll get your full rebuttal. That's great. Thank you very much. All right, Mr. Charnas. Good morning. Good morning. May it please the Court, my name is Adam Charnas, and I represent the Aptly Pursuant Health in this case. I want to start at the outset by emphasizing that the only issue that Lavery preserved below is the argument that he provided additional intellectual property at closing of the contribution agreement in addition to the patent. The 3%, 1% argument, the joint venture argument, the deferred compensation argument, none of that was preserved below and is not properly before the Court. Now, for the reasons that I think Your Honors have expressed, the argument he did preserve is erroneous, as the district court found. Chief Judge Sutton, as you said, Lavery had an obligation to identify what non-patent IP he claims he transferred at closing of the contribution agreement. And he was asked at his deposition over and over again what that IP was, and he denied providing any of it. He said he didn't provide any documents, he didn't provide any business models, he provided no ideas regarding development, implementation, expanded use, or commercialization of the kiosks, he provided no trade secrets. This is clear on the record if you look at page IDs 456 to 59, 467 to 470. Does all of that have to be transferred right at the time of the contribution agreement? Can it be, I understand your friend on the other side a little bit saying like, yeah, I did give some of those things in services later when I was giving, you know, my knowledge, which can be proprietary, and that, and that could have counted as these kind of other intellectual property things that were given. Two responses to that. The answer is both are no. The best answer is the contribution agreement itself. If you look at page ID 508, paragraph 1.1a of that agreement, and I'm quoting but taking out a few words that are not necessary, it says, at the closing, all assets listed, described, or referenced on Exhibit B here too, the intellectual property, shall be contributed in full to the company. At closing, all assets listed on Exhibit B shall be contributed to the company. So that means at closing, they should be contributed. The stuff that is developed later, if it qualifies as intellectual property in the generic sense, that doesn't count. And the reason that doesn't count is that the consulting agreement provides for, as separate provisions that, very long provisions, that deal with the intellectual property, any intellectual property that's developed as part of that consulting relationship. In fact, the consulting agreement requires him to develop new ideas. And it says that the company is the owner of those new ideas under the work for hire doctrine. So the consulting agreement expressly says, you were to develop new ideas, and we own them. That's under the consulting agreement. The contribution agreement is what happened, is what was conveyed at the moment the contribution agreement was signed. At his deposition and in discovery, Lavery could have presented evidence if there was any of that other stuff, and he just didn't do that. And we didn't hear that from my friend on the other side either during his argument. There just is not that other stuff. What's wrong with the notion, I know you say it's forfeited, but the Third Circuit idea that if the royalty is on a product that would not violate the patent, then it doesn't raise the, expand the monopoly, leverage the monopoly beyond the 20-year term, that would if it was a royalty on the patent. Your Honor, let me answer that in two ways. The first way is that that's not this case. Lavery conceded in the district court, in fact he expressly argued in the district court, that the kiosk practiced the patent after patent expiration. For example, in his opposition to our motion for summary judgment, page ID 686, he said, quote, pursuant is currently using the concepts referenced in the patent. That was after patent expiration, that was after discovery closed in this case. Page ID 704, he says the same thing. Entered interrogatories, pages 608 to 609, he says the same thing. So he conceded that the kiosk, from start to finish, practiced the patent, start to finish, start of commercialization. So even though it never used the, even though it never provided vision, I don't know if it does today, but a large portion of it didn't provide the retina scan? It never provided the retinal camera, that's right. If you look at the patent, there are 18 claims in the patent, 16 of them have nothing to do with the retinal camera. Retinal camera is only mentioned in two of the claims. The main claim, claim number one, I'm not a patent lawyer, but the first claim seems to be an important claim, it's just a medical screening kiosk. And as I said, he conceded below. I do want to go back to Chief Judge Sutton, your first question about jurisdiction, I commend the court to the... Can I just say one thing about that, because it just got me thinking on this point? It's so strange to say that the issue in front of us is whether patent law preempts a contract, and yet we have authority over the case. How does the question presented not prove that this is in the heart of the exclusive jurisdiction? That's just, I'm struggling with that. Well, the circuits have said it's not, and C.R. Bard, the Ninth Circuit, I commend you to footnote three, which addresses this expressly and says, listen... The best argument on this point is Brulat and Marvel. Brulat and all these cases... All those cases prove, one's a state court case, one comes out of the Court of Appeals, so I got it, I got all that. But I'm still in my head going, how can it be that... He likes to frame it as preemption, and I think it's fair-minded to call it preemption. If it's preempted by patent law, how is this not in the heartland of patent law? And this Court addressed this issue in Bogle, and this Court has also addressed the issue. What C.R. Bard says is, the statute says cases arising under the patent laws are in the exclusive jurisdiction of the Federal Circuit. What the Ninth Circuit said is, arising under has a well-defined meaning, well-pleaded complaint rule, or I guess it's some version of that now. You look at the complaint, this is a complaint for breach of contract. That doesn't arise under the patent laws, therefore it doesn't arise in the Federal Circuit's exclusive jurisdiction. You might remember this line of authority about incomplete preemption cases outside patent law. Do we say those arise under federal law? Well, there is an exception... Isn't that right? Yes, no one has argued complete preemption here. In other words, the patent law doesn't occupy the entirety of this dispute. After 20 years it does. Well, no. It occupies a question about whether the contract term allowing perpetual royalties is preempted or not. It does, but it doesn't occupy the entire field of the case. The case is largely governed by contract law. Talk to us about the rest of this case. No, not at all. As I said, the only argument that's preserved is the argument we've been talking about. Can we get back to... You distinguished the rule on the facts. Do you think there is a concern with the Third Circuit rule on the law? Do you think that it is a good rule? That if the royalty is on a non-patentable product then there is just no brulette concerns and you can have an indefinite royalty? No, I think Judge Sutton made the point. The question is... Again, that's not our case. We haven't briefed it. I haven't thought about that particularly intensively. But I think the question is whether patent leverage has been used. If you use the leverage of the patent to get a royalty broader than you otherwise would, then I think it falls... What if it's just a stream of revenue? I'm going to pay you this amount of money a year. You can use my patent however you want for the 20 years. It's not on any product sales. It's almost like a loan. It's $20 million, so much a year for 50 years. Would that violate it after 20 years? So you couldn't even get a loan that had a term of repayment longer than 20 years? No, I think at some point the answer is no. I guess my instinct would be if the only reason you got those terms is because you had the patent and you were licensing it, then that would be a use of the patent leverage. Can I just modify the question? I like the question, I'm really enjoying this, but just put it this way. You could have taken the 3% and made it 3% at the start, 1% at 20 years, and said the 1% was going down this road. It would not have been hard. Let's say Exhibit B said, I, Lavery, am giving pursuant A, the patent, and B, the following trade secrets identified by name, and the royalty is 5% until the patent expires, and then after the patent expires, 2.5% for use of the trade secrets. That would survive Kimball. Kimball says that expressly. That's not the case, because there are no other things. Number one, there are no other... What about if it said it was also compensating for what we'll just call proprietary? That in the consulting agreement, I'm not just charging more than $20 an hour. Every time I do those hours, whether it's under $20 or over, I'm telling you things I know as the guy who's developed this, and we're going to compensate you for that beyond 20 years. Yes, it could have been painting the house, as my friend, I think, gave an example in his brief. As long as it's not the patent, that body of other stuff, whatever it is, IP, non-IP, it doesn't exist in this case, because Lavery conceded in his deposition he provided nothing at the close of the contribution agreement other than the patent. So we have a situation here where it's just the patent royalty, and we have a situation where the product, the kiosk, on which the royalty is based, practiced the patent before the patent expiration and after patent expiration. What do you think should happen? Suppose there was a clear trade secret. The record doesn't show a clear trade secret here, but just assume there was, and it was the same term. So just as Kagan's hypothetical on Kimball was 5% during the term of the patent for a patent on a trained cigarette, and then 4% thereafter. What if it was just continued 5%? The ironic thing about this argument is it doesn't get them victory anyway. Because the situation when you can have a royalty based partly on a patent, partly on other stuff, IP or other stuff, is that you can say, when the royalty goes down at expiration of the patent, the court can presume that the continued royalty is on the other stuff, not the patent. But here, labor received 1%... No, go ahead. Labor received 1% before patent expiration and 1% after. But it does seem quite unfair to invalidate the entire... So in this case, it may not have been a patent on a trained cigarette. But in another case, if it legitimately was a patent on a trained cigarette and the trained cigarette had value, it seems quite strange to me that we would not allow for any post-expiration royalty. Because you're basically getting rid of the trained cigarette, too. I understand what you're saying. Justice Kagan's opinion said this was all workable. But how is this workable? Do we rewrite the contract to 0.5%? I'm going to respond to Judge Murphy. My bill will follow, Justice. It's all economics. I always spend my miles as fast as I can. I always spend my credit card stuff as fast as I can. If you want to front-load, you can front-load. It's not irrational to say, we're going to make all our money in 20 years and after that, who cares? There may be reasons not to do that, for example, spreading risk of bankruptcy and other things. I agree with you. My response to Judge Sutton now is that everybody doesn't have Judge Sutton as their lawyer. So what happens if they actually draft a contract because they have lawyers who don't know what Verlet is about? And then we have 1% and you're saying that we have to get rid of the trade secret? It wouldn't seem right to me to not allow for any royalty post-trade secret. to not allow for any royalty post-trade secret.  I'll respond to that a couple of ways, which is, number one, whether it seems right or not, and I agree with your sense, the Kimbell Blatt cases, that's how they've applied it. Again, that's the example Justice Kagan gave was a lower royalty to account for the trade secret. Number two, I completely agree that despite the simplicity that Justice Kagan ascribed to her own test, there are a lot of hard questions that arise that some of which you've alluded to. Fortunately for you and for my client, they're not in this case, because the facts don't implicate any of those. Here, it was a pure patent royalty. The kiosk practiced the patent before and after. There were no trade secrets that were provided. That's the easy case under Kimbell. Could you still win and have us say we are inclined to agree with the 3rd and 9th Circuit's assessments of the case law? Yes, because the facts are completely different. The 3rd Circuit case is an interesting case. It's really long and complicated and adopts a very... Not happy about Brulat. I've read that case about a dozen and a half times and I still don't think I understand completely what's going on. The ironic thing is, in that case, the licensee did not practice the patent after patent expiration, which would have seemed to be the easier ground for the court to resolve the case. The court seemed to be impelled to explain the world, explain the universe and its opinion. Judge Porter is a good guy. I'm going to have to cut you off there. These are hard areas. None of us are experts in this area. I can understand how he wrote it the way he wrote it. Anyway, just defending the bench. I think the facts are different in those cases and in Zimmer. In the line of asking you questions about facts that maybe are not here, it strikes me here that the patent is written extraordinarily broadly. It covers so many things, not just the eye scanning and all of this stuff. Maybe going forward from these cases, are we encouraging a system where the patent is actually narrower and other things are trade secrets or other things are other IP and therefore a royalty can sustain longer than the 20 years? Is it a structuring question? There's a whole system of patent examiners that are supposed to make sure patents satisfy a number of criteria. That they're not obvious, that they're rigid, all these things. I think it's fair to look at this broad patent and scratch your head a little bit. This court definitely doesn't have jurisdiction over that question. No one has challenged the validity of the patent. I understand that. In the world of can you contract around these things? It's a surprising number of all of these cases that involve Kimball and Brulat it's pretty clear that the lawyers who drafted the licenses didn't know that the doctrine existed and that's why they got into the mess they did. If you had anticipated it, particularly after Kimball, you could easily write around it. That's probably true of half of our cases for what it's worth. It's not just a patent issue. Thank you. I think we understand your position. Thank you very much. Mr. Smith. First, there was no adjudication below about any infringement of the patent. Brother counsel has said they practice the patent, they practice the patent. There's nothing in the record I don't think to support that. He cited something from the summary judgment our response to the summary judgment where we conceded that they used the concepts expressed in the patent. That's a long way from infringement. In a patent law you look at the client and it's a piece of real estate and if it falls within those lines, yes, you're practicing the patent. Why would that make a difference here? Let's just say everything you just said is right, how would it make a difference? Because as a patent lawyer, I would never write a royalty agreement and do a contract for a licensing agreement that was structured like this. You would always say if it infringes the patent, you owe us a royalty. If it doesn't infringe, look at something else. We can pay you something else. I've never seen a royalty agreement in a pure patent royalty license that was written like this where it's just so broad. Any kiosk. That's not how a patent license agreement ever works. If the kiosk infringes the patent, then you owe us a royalty. That just supports the joint venture argument that I made earlier. I hope that explains how it relates. The leverage issue, I didn't get into it a lot, but in the record, Bart Foster, who was the counterparty to us, Dr. Lavery, I put it in both of my briefs where he said that he was acquiring the patent for only one purpose. It wasn't to practice the patent. It was to use it as leverage for his former employer to extract from his former employer Foster's invention. So in the question of using leverage, which is what concerned the Brulat court with the farmers and the hop-picking machines, rightly so. I'm actually a farmer, so I can sympathize with that. But that was not the case in this situation. There was no overweening leverage by the patentee. And to your point, Judge Sutton, front-loading is not always possible, especially in something like pharmaceuticals, where the parties don't know whether the drug is going to be successful. There are ways now that we can address that, not very effectively, as Justice Alito said in his dissent. There are costs to decisions like this. Any questions? Thank you so much. Both of you wrote excellent briefs. Great oral arguments. Thanks for answering all of our questions. We really appreciate it. We'll find our way through this, thankfully, with your help.